on behalf of the appellant Stephen Arthur Hillman. Your Honor, the district court erred in this case by allowing the government to introduce evidence of statements made by Mr. Hillman while he was in custody in the secondary inspection office without the benefit of Miranda warnings. Does that count as custody? Your Honor, I think that specifically looking at the case of the United States v. Estrada Lucas, that we can see that it was in fact custody. In this case, Mr. Hillman had gone from primary inspection, which is a very open area outside, to the secondary inspection area outside the office. I thought the test was if an innocent person were in that situation without drugs, could he have expected to be freed to proceed when they were done with the search? Yes, Your Honor. The test is from the perspective of a reasonably innocent person looking at all of the factors that have been outlined. You just have to be reasonably innocent? Yes. That's what the phrase actually is, is reasonably innocent, which is kind of a strange phrase. It's true. But I think what's interesting in this case is that Mr. Hillman had first declared the item as water, then declared the item as alcohol, and then gone back to declaring the item as water. So at that point, he had actually already committed a crime of some sort, be it not even disregarding the fact that it ended up being ketamine in the water bottles. He had either made a false statement to a federal officer by falsely declaring that the item was water when, in fact, it was alcohol, or he had first declared it to be water to try to smuggle in extra alcohol, which would be in violation of the Code of Federal Regulations, which requires you to only bring in one liter of alcohol if you're bringing in alcohol at all. And in this case, I believe it's not. Maybe that's why they said reasonably innocent. Perhaps. I mean, they find a little undeclared alcohol in somebody's luggage. Don't they just charge them the tariff or duty or something? Right. Yeah, the Code of Federal Regulation is Title 19, and the code is Section 148.33, and it doesn't actually go into the fines and penalties, but it speaks of that you should only bring in no more than one liter of alcoholic beverages. But what's interesting in this case, I think even a completely innocent person taking out those statements of, it's water, it's alcohol, it's water, he has had his IV taken, he's been patted down, all of his belongings are being gone through right in front of him in the secondary inspection office, and they're pulling out these bottles, one, two, three. There's two water bottles and one shampoo bottle sitting in front of him, and then they start testing it. I think even a reasonably innocent person, an innocent person at that point, when they're testing a substance they found in someone's bag. If they were innocent, you'd find out they were going to test and find it was water or alcohol. Well, I think what's... The only thing that makes him feel really uptight is that he knows it's not. Well, I think that what is unclear or what's strange about this is that they had already opened one of the bottles at primary inspection, shaken it, and then smelled it. The inspector testified that it's a very strong medicinal smell at page 173 of the excerpt of record. And then that's when they then went to the next stage, which was the outside secondary inspection office area, and then into yet a smaller area, which was the primary or the secondary office. And I think the physical locations, while in the grand scheme of things, a 10-by-12 room with a counter isn't that coercive, but going from primary to secondary outside to secondary inside is, you know, inherently getting it to be more coercive than if they had just been outside and they had been testing it where there's other people around and people milling about. Well, counsel, even if we found, for the sake of argument, that he was in custody, I have a difficulty under Miranda saying that he was, quote, interrogated. They simply said, where did you buy the water? Okay. The interesting thing about that question is that it is at that point interrogation, because under Innis, Rhode Island v. Innis, we know that it's any question or statement reasonably likely to elicit an incriminating response. This question was directed to Mr. Hillman, and that is going to possession, ownership, or control of whatever the substance is. I think that that question, because it's directed to Mr. Hillman and not to Mr. Ryan, who was another person present who also had bags that were also searched, that the inspectors at that point are trying to elicit who actually brought the substance over, be it water, alcohol, or ketamine, as it ended up being. And so I think that's what they were going for. Excuse me? It wasn't in Hillman's backpack and such? Well, there was testimony that they recalled that the backpack and the bag was Mr. Hillman's items. But so that was why the question was directed to Mr. Hillman. So why would you ask somebody else? Well, I think that. When Hillman says that's water and it's in my bag, why would you ask somebody else, though? Where did you buy it? Well, there were. That doesn't make sense to me. There were multiple bottles found in different bags. I think that two bottles were in one bag and one was in the other. And it wasn't clear at that point whose bag was what. Some statements that actually were suppressed by the court was after the agent came and asked whose bags were whose. And those statements were actually suppressed by the court when Mr. Hillman did declare that the bags that had been searched, that the ketamine was found in, were his. But those statements were suppressed and were not brought into evidence. The second issue that I'd like to address is the sufficiency of the evidence as to the possession with intent to distribute count, which was count two of the indictment. Normally in these cases it's a more known substance, something like marijuana or cocaine, where if someone says that they have 10 pounds of cocaine, it's pretty clear to anyone that this substance isn't for personal use. I actually didn't know until I was a district judge exactly what amounts signified what. I don't know if ketamine and cocaine are all that different. Well, I think that ketamine is quite a bit different. It's only been on the federal schedule since 1999, so it's a relatively recent drug that's being specifically attacked by Sections 952, 960, and 841. Let me tell you what's on my mind about the sufficiency question. The government's case is kind of thin on it, that all we really know is that they use 10 milliliter vials. I think all the jury knew was that they use 10 milliliter vials for cats. Is that right? Yes. Cat anesthetic. I'm wondering if there are two things that are enough here. One is the jury knows the stuff comes in 10 milliliter vials, at least for cats, and the second thing they know is this guy has it in water bottles, funny containers. Can they infer from those two things this is a lot of ketamine? That's all they have to infer to figure it's probably for distribution. Well, I don't know if that's exactly true. The case that I mostly am relying on is not a case from this circuit, but is from the D.C. circuit, which is United States v. Stevens. And in that case, the circuit court found that it was insufficient evidence even though Mr. I think it was McCray, it was the co-defendant, not Mr. Stevens, had $511 in cash on him. It was in a high drug area, high crime area. He had 5.9 grams of crack cocaine, and there was expert testimony that 5.9 grams of crack cocaine was a lot of cocaine. And they still found that that was insufficient, mainly focusing on the fact that the crack was not in distribution size quantities, basically, that had been parsed up into little packages and there wasn't packaging to show that it was going to be distributed. Well, counsel, did you ever introduce any evidence that would suggest that this was being imported for legitimate use? For legitimate use? No. I suppose it could even be illegitimate personal use. Yes. And you'd still have an argument on this. Did you introduce evidence of that, that he's a ketamine user? No, we did not. Do we have any idea from this record if a human being is going to take this stuff to get high or whatever people get on it, how much they take? No, we don't. So this could be three doses as far as we know. Right. Yeah, there's no evidence in the record either way as to how much a person would use for illegitimate uses. And we also don't know what the shelf life of this stuff is either. We don't know how long it lasts if you're just keeping it stored somewhere in your home or something like that for your own use. Personally, we've never asked that question about cocaine and such. I don't think I've ever heard anybody ask, what's the shelf life of marijuana or cocaine? I mean, shelf life for cocaine could be 30 years as far as I know, and some guy might think, you know, this is really dangerous business. I'm going to go and buy myself a big stash of cocaine. I'm not going to go on the streets every three days. He gets his lousy stuff. I've got plenty of money. I'm going to buy a big stash. I'm going to store it for the next 30 years. Right. We never asked that question in cocaine, I think. Right. And in those cases, the government introduces their value testimony to show that cocaine is worth so much, and they also have that same expert testify that there's no way that a person could possibly imbibe that much cocaine or marijuana or whatever it is. They have an expert testify that it's a distributable amount. And so that's the difference between these two cases, is that there was no testimony from the government's witness about how much ketamine this really was. All we know is what is usually packaged in for legal defense. I suppose in one of those cases the defense could come and say, Well, look, I'm a very wealthy man, and it doesn't matter if it's a lot of money. And it has a shelf life of 30 years. I'm going to keep it on my shelves. So I guess you could make that argument. I would imagine that you have no distribution paraphernalia. Right. Or guns. That would make one misdemeanant. Yes. There was actually a case in our district that they did that with, I think it was, two pounds of methamphetamine and were successful. Yes. So that is a distinct possibility. I think that, I mean, this case is just unique because ketamine, like I said, is in a very known substance. And the government could have found someone to testify about what an illegitimate use is and about that this clearly was for distribution purposes, but their expert simply wasn't qualified to do so. You know, I don't know quite how to handle this, but I was kind of wondering about the judge's ruling that he wasn't qualified. Basically, the guy was mostly self-taught. Right. There are things that I went to school in and things that I was self-taught in. And a lot of the things I was self-taught in, I actually know more. When I go to school, instead of searching the Internet myself and reading everything of interest, the professor searches the Internet or the teacher at a CLE searches the Internet and he tells me what he thinks is of interest. Right. And it's usually a subset of what I would have read. And it's not original sources. I'm just getting what the teacher says about other sources. Why shouldn't this expert have been allowed to testify and does that matter? Can we consider that? Well, I don't think that it matters. The government did not raise in cross-appeal that their government, that their witness should have been able to testify about the other. They don't have to cross-appeal. They're trying to get an affirmance, not a reversal. Well, I think that they. . . How in the world could they ever get an affirmance on the basis of evidence that wasn't in before the jury? Excuse me. I'm sorry. How in the world could they ever get an affirmance? I mean, that's one of the problems the government always has in criminal cases. Right. If the judge improperly kept it out, I suppose we could say it's improper for future judges. But if the evidence isn't in front of the jury, isn't that the end of it as far as our appeal is concerned? Well, that would be my argument. But to be honest, I haven't really looked into that specifically. But what's interesting is that I don't think that it's really fair to say that, you know, the poor government didn't have the right expert. Well, they could have gotten another one. I mean, while ketamine has only been on the schedule since 1999, it has been prosecuted under the 545 laws for much longer than that. And so there's no reason that there isn't someone who's more involved in ketamine seizures, ketamine investigations than this person that they particularly called. And the person they happened to call just wasn't qualified enough, at least according to the judge and according to my argument as well. Unless Your Honors have anything further at this time, I'd like to reserve my remaining time for rebuttal. Thank you, Counsel. Thank you. Counsel. Good morning. May it please the Court, my name is Christopher Alexander. I'm an attorney in the United States Attorney representing the United States in this matter. In essence, there are three issues that are presented here today. First, concerning statements. Second, concerning whether the defendant, whether enough evidence was produced in order to sufficiently support the jury's verdict. And then finally, what was the appropriate jury instruction that should have been given in this case? Could you help me? Okay. It's a little out of order, but it's the issue that interests me the most, sufficiency of evidence on purpose of distribution. Basically, I'm willing to go with the government on the proposition that if it's really a lot of ketamine compared to what a person would use for his own personal enjoyment, or actually I don't know exactly what feelings people get out of this ketamine aesthetic. But basically, if it's really a lot of ketamine, that's probably good enough. But how can I tell that it's really a lot of ketamine? Well, Your Honor, looking at three separate things. First, there is evidence in the record concerning the diversion expert breast that you testified concerning personal use. And that essentially the amount that was used in this case, taken in small increments, would have been about 17,000 dosage units. I'm sorry. Where is that? Before the jury. Not in the record. Not before the jury. That's our problem. But that's all that matters is what's in front of the jury. You know, I think we all understand what this guy said. The record doesn't matter. Tell us what evidence that would support this verdict. Evidence that the trial isn't going to support the verdict, I assume we all agree on that. Right. Do we not? Again. And there's nothing for it. We also agree there's nothing for it. If it should have come in, but the judge, for some scurry reason, kept it out. It still isn't going to support the verdict. Is that right? I'm not willing to concede that point, Your Honor. So you think evidence that's not in front of the jury will still support the verdict. Is that right? Yes, Your Honor. And looking at the general prospect you have, for example, in cocaine cases, if evidence isn't necessarily presented in the cocaine cases indicating that there is a large amount of cocaine, the court can certainly take judicial notice of the fact that this is a large amount of cocaine. Wait a minute. Maybe we can. But he's still entitled to jury trial. Right. And under Jackson v. Virginia, he may even get a jury that says, we just don't feel like convicting. And under Jackson v. Virginia, the question we're supposed to ask is, could any reasonable juror have concluded from the evidence presented to the jury that this quantity or packaging or anything about the ketamine was such that it was beyond a reasonable doubt for distribution? Well, beyond what we don't know is what the experience of the individual jurors were. Certainly looking at the guidelines themselves, the guidelines themselves also indicate that based on the quantities here, there were at least 7,000 dosage units. The individual jurors themselves may have had knowledge that they brought to the jury. Good point. You could have a real head on the jury who knows more than any of the rest of us about ketamine. That's correct. But I think we're supposed to say reasonable juror infer from the evidence. Right. And what a reasonable juror could infer from the evidence? Again, looking at, as Your Honor pointed out earlier, the evidence that was presented to the jury indicated that these things usually come in 10 milliliter vials. That is not. That's for cats. I have cats. They're small. Well, Your Honor, that's actually used to anesthetize cats. The 10 milliliter vials themselves are distributed to veterinarian clinics. The thing about cats, their metabolisms are different. We don't know exactly how they work. But probably more important, body weight. I mean, my body weight is a lot more than my cat's. That's correct, Your Honor. And looking at the evidence that was presented, you had essentially somebody with 350 times what would possibly be considered a dosage amount. If you look at just in general. A dosage amount for cats because we don't know about humans, and he was charged with importation for an illegitimate purpose, not a legitimate purpose. So unless we know how much a human being could take, how is that sufficient to infer? Again, we don't know because the evidence was suppressed concerning what an individual would be receiving. But what the jury did know is that this usually comes in 10 milliliter vials. And the defendant wasn't charged with bringing in the ketamine for an illicit purpose. He was charged with bringing in ketamine and essentially failing to declare it once he was bringing it in. Now the defense wants to present to the court that the government had approved these additional elements. Namely that it was for illegitimate use and that it was done without a proper declaration. Well, that's switching to the other count, is it not? I mean, I thought we were talking about the second count, possession for distribution. Well, yes, Your Honor. And concerning the possession with... Are we beyond that now? I mean, is that all you have to say about possession for distribution? No, Your Honor. I'm trying to answer the questions. But specifically for the... I was thinking about what you said, and I'm thinking the one drug sort of like anesthetics I know about is diazepam, Valium. And dogs' doses are actually much higher than humans, even though the dogs are smaller. I just, I don't think I know anything about how much ketamine you need to get high. Well, and from the record that was presented to the jury, you don't know. From sources outside, certainly the court can note that there is evidence out there. But the jury wouldn't have been allowed to look at them. They're not allowed to go on the net and find some underground gethigh.com and find out. And that is correct. The jury is specifically instructed not to do that. But certainly they bring their own... So how could they infer, reasonably infer, the intent to distribute from the evidence that they had before them? Again, looking at the dosage units, let's assume that you go and buy a bottle of aspirin. And you take individual pieces of that aspirin. By comparison, that would be essentially the equivalent of those 10 milliliter vials. You buy what is essentially either what is the dosage unit or what is less than the dosage unit as a part of the distribution. That's what was presented here. The dosage unit, the jury certainly could have assumed was 10 milliliters or less. For cats? Well, they could have... Isn't that not right? I mean, maybe a tenth of 10 milliliters for a cat. Yes, Your Honor. And certainly... Well, how do they make any inference about people? You know, it sounds like we're in the interesting philosophical debate about jurors are supposed to be a tabula rasa, and yet they're not supposed to be because they're supposed to bring all the information they have in their own heads. And I don't know how one cracks that, cracks that particular problem. But it sounds like that's what you're saying. Well, any juror would know that he takes, when he buys an aspirin, that's the dosage unit for aspirins for people. Your vet might tell you to give half of that to the dog, but that's another question. That's the dosage for people. So that's what every juror knows. But what does a jury know about this stuff? Well, again, what the jury knows is that this defendant had 350 times what was ordinarily a dosage unit for a cat. Yes. They knew that he had more than what would ordinarily be that for a legitimate use. Well, presumably he's not going to be... Even if he's going to distribute, he's not going to be distributing it for cats, I guess. Maybe he is. Maybe he's going to distribute it to veterinarians. I don't know. What if he's going to take it himself? Even if that were the case, and again, Your Honor, one of the things you're focusing on is on human use. Let's say he wasn't going to be using it for human use, that he was going to be distributing it to vets illegally. That, again, he is importing a controlled substance into the United States. And he is intending to distribute that to, whether it be individuals, vets, whatever. It's still for a use that he would need to have a permit to do so. And he did not have a permit, and certainly introduced no evidence that he had a permit. Okay, so let me see how you're following. So your argument would be that the mistake we're making, the logical error, is to say, well, distribution would be illegal distribution for the use of human beings. And it could be that he's planning illegal distribution for the use of veterinarians. And the statute doesn't say that it can't be that kind of illegal. And so, therefore, the jury can say, well, we know what the dosage unit is for a cat. This guy must have been doing it for illegal distribution. Is that your position? Your Honor, that is certainly something that the Court could consider as a part of the jury making a reasonable inference as to support the jury's verdict, that there was possession with intent to distribute. I don't know what you mean by consider. See, consider is an interesting, sort of a weasel word. Are you telling me the jury could find him guilty of this crime on the basis that he imported ketamine for the purpose of distributing it to, for the use of cats, to veterinarians? Your Honor. On what was argued to the jury and what was put before the jury in terms of the instructions, is that right? Well, Your Honor, I would need to further supplement on that particular issue. I don't need to supplement. I just want you to tell me, is that what you're saying? I think the jury could make that distinction and could make that finding. Again, we're looking at a controlled substance here. It is a controlled substance. Now, looking at the controlled substance itself, even the CFRs say that an individual that is going to be using ketamine and is going to be using it as a part of their veterinary practice needs to be licensed in order to use it. So, again, looking at what was being done here. This person possessed the ketamine and this person certainly intended to distribute it. Again, not only looking at the 10 milliliter vials and that he had 350 tons, what would ordinarily be that which was distributed. He also, as the court pointed out earlier, had this in water bottles. Again, indicating that his intent was to bring this across and that it wasn't for personal use. He was essentially hiding this and attempted to conceal the ketamine in his bag. That doesn't necessarily get you there. It certainly does suggest concealment and consciousness of guilt and consciousness that it's contraband. I go each of those steps with you. But then I'm thinking marijuana smokers keep it in a Sucrex box or someplace like that, some innocent-looking means of hiding their stash. Even if it's personal-use stash, it doesn't have to be a commercial stash for them to want to hide it. And I don't think, again, getting back to the amount here, that the court can turn a blind eye to what was presented. This is 3,500 milliliters of ketamine. Again, looking at my problem is I don't know if it's a lot of ketamine. That's just it, Your Honor. When dealing with cocaine, again, you don't know, as you indicated before, you didn't know until you got to the court what was a large amount of cocaine. But you know now as a result of seeing cases and what has come down. Again, as the defense counsel pointed out, ketamine is a newly scheduled substance. And looking at the cases out there, there really isn't any specific cases that address what is considered a large amount. So how could the jurors infer that he was going to distribute this on the basis of your own reasoning? Well, not necessarily that the jurors. The jurors certainly could have assumed that this was a large amount of ketamine. And the court can also make that assumption based on the evidence for the law that's out there concerning the guidelines. We're going back to what the jury could infer, I think, in this case. Right, right. And what the jury could infer is that this was a large amount. Again, the large amount doesn't necessarily have to be, the evidence doesn't necessarily have to be presented to the jury. It's just is there a large amount here? And here there is a large amount. And objectively, is there a large amount? Objectively, when we look to any factors, objectively, this is a large amount of ketamine. Moving on to the custody issue, at the time that the defendant was being questioned about this substance and he was asked what he was doing and where he was reporting, they were testing the substances indicated by defense counsel. And there was an issue concerning whether the case would have been possibly prosecuted for not failing to declare alcohol. Again, looking at the Estrada Lucas case, Estrada Lucas cites United States v. Luther, which also talks about administrative, if a case is going to be processed administratively, a reasonably innocent person wouldn't necessarily feel that they were in custody at that point. Well, in the Estrada case, you know, they said when they presented the evidence before him and placed it before the defendant, that's one of the factors in the Butler case that determines whether or not it was custody for the purposes of Miranda. Now, they did present it as they did in Estrada. What is your response to that? Well, Your Honor, there's a distinction between the Estrada case and this case. In the Estrada case, at the time that the inspector saw essentially $19,000 worth of jewelry, and this is in 1980, when the inspector saw $19,000 worth of jewelry, at that moment, the inspector knew that there had been a crime committed, namely the 545 violation. Now, at this point, in the Hillman case, the inspectors didn't know that Hillman had committed a crime until there was a positive result for the ketamine. But the positive result was actually preceded by the defendant's statement that it's ketamine. So at that point, once he admitted that he had committed a crime, then he was in custody as properly found by the district court. And that's the distinction. The distinction is you see the jewelry, you know that you committed a crime, you know that essentially the jig is up. At the time the substance was being tested, there are three things that could have happened. The test could have came back and it would have been water and nothing would have happened.  And the defendant would have been free to leave. Or finally, it could have been a non-positive. And the defendant, again, would have been free to leave. The only result that would have prevented him from being free to leave is a positive result. They don't bust him for minor impossession if it's alcohol or for lying to a government agent in the course of his duties? Well, Your Honor, looking at essentially how things are handled at ports of entry, these cases are handled administratively. They aren't a federal prosecution that typically takes place. What somebody typically has done at the ports of entry, consistent with United States v. Luther, is it's prosecuted administratively. I was thinking kids probably come back from Tijuana with tequila in their backpacks. Yes, Your Honor. And at best it would be handled administratively, if prosecuted at all. And a person that had simply failed to declare alcohol wouldn't necessarily feel that they were in custody for Miranda purposes at that point. And again, we go back to what is the test. The test is the reasonable, innocent person. Even if all of their belongings are confiscated during the time they're being held? Well, Your Honor, the belongings weren't necessarily confiscated for Mr. Hillman. Mr. Hillman, along with his friend, Mr. Ryan, were seated in this 10 by 12 room with a counter in the middle and a computer sitting on there, and two inspectors while this questioning was taking place. This was not a coercive environment. Their belongings were placed on the table and were sitting there. They were not taken out of the room or taken to another location or anything else along those lines. Their possessions and everything was sitting in that same room. And it's important to note that Mr. Ryan was also present. His friend, he hadn't been escorted to a different location. He was still there, still present, still available, and this environment in and of itself was not very coercive at all. And certainly not in violation of the Miranda warning in order to create an issue of custody. How much ketamine did he bring in again? He brought in 3,550, essentially 3,553 milliliters of ketamine. And again, going back, that's over 350 times what ordinarily would be contained in a 10 milliliter vial. And he was bringing this in. I actually did look it up on the net to see how much you take to get high, and 25 to 100 milligrams seems to be the dose. So it really is a lot of ketamine, but I know perfectly well that a jury is not allowed to look it up on the net during deliberations. That's right, Your Honor. And again, the district court made the determination that diversion investigator Brassis wasn't able to testify concerning that, and that decision was made on the day of trial. The defense counsel made reference to the fact that the United States could have sought out another investigator, but at the time it certainly wasn't something that was available. And with that, the government would submit. Thank you, counsel. Thank you. There's a couple things that the government brought up that I'd like to address. The first one was the discussion between government counsel and Judge Fernandez about whether the jury could have inferred that he was importing it to distribute it to vets or for cats. And basically the government counsel in their closing argument didn't make any such claim that he was importing it so that he could distribute it illegitimately and to make money or whatever it is, and that that was the reason for him bringing it in. They actually didn't really say anything about that in their closing argument, in their summation. I'm sorry. They didn't say anything. They didn't say anything about why he was bringing it in or for what purpose it was being brought in that I can recall from the record. Well, why wouldn't one assume it's for an illegitimate use? Why? Excuse me? Why would not one assume that it was for distribution if the normal amount that companies distribute of ketamine is in 10-milliliter vials, and this is an enormous amount, and so he's bringing it in to distribute it to sell it on the market. You know, a lot of smugglers don't smuggle drugs. They smuggle other things. That's true. Well, I think that that's just the problem with that is it's the stretching of the line, is that the government only presented that, you know, it was 3,553 milliliters, and it usually comes in these 10-milliliter vials. The government counsel mentioned the aspirin, you know, buying what's close to the dosage unit of aspirin. But you go to Costco or one of those warehouse stores, you can buy a big, giant thing of it, and for less money, and you keep it for yourself. You're not necessarily selling it on the black market or anything like that, but it's because it's cheaper that way. And so there's inferences both ways, and I think the inference that he was going to be distributing it to veterinary clinics just doesn't make much, a whole lot of sense for the way that the case proceeded. And the problem with that is, too, if they were going to make that claim, then I think that would bring up the problems that are addressed in my third argument, which is that then the government, we would have had to know whether it's a narcotic or non-narcotic substance and which of the legitimate use exceptions would have applied. I don't know how that would really work if you're distributing it illegitimately but for a legitimate use. I'm not sure what exception would apply there. But under 952B, you can bring in, if it's a non-narcotic, as long as you're bringing it in for medical or other legitimate use and there's some sort of declaration, then you can lawfully import it. And so if that was going to be the government's argument that he was going to be distributing it illegally. He would have to show that he had done the paperwork, I think, wouldn't he? Well, for 952A, yes. 952A is for a narcotic substance and there you have to have. Even for the non-narcotic? I think that that's more unclear. It just says that it is imported pursuant to such notification or declaration. And I don't think that it's as clear that you have to do as much as you have to for a narcotic substance. You probably have to do more than blurt out as you're starting to test it. Oops, it's ketamine. That probably isn't what they mean by declaration, is it? You've got to file that form. I had a case about some guy who imported some parakeets. You can't get high on parakeets, but they still have to declare them on this form. Right. Yeah, that's for the agricultural and animal importation or something like that. We get those cases still, parakeets and parrots. You know, you argued in your brief that Hillman, quote, declared the ketamine. Isn't that a little off base? Well, it's basically under Sanchez Lima, any evidence, a scintilla of evidence, which goes to a theory of defense warrants the instruction being given by the judge. This was a belated, reluctant statement made only once he realized he was destined to be caught. Well, I think then that's. How can this be a declaration? I think that then that kind of helps my argument that he was in custody at the time. But the Sanchez Lima and the other cases about theory of defense instructions have stated that the evidence can be inconsistent. It can be very minor, but if there's something there, then the instruction should be given, because it's better to leave the decision up to the jury than to the judge. And I think that that's really the whole point. Obviously, my stronger arguments are as to the distribution count and as to the Miranda issue. But I think that Mr. Hillman was in custody in the secondary office. He'd been brought from outside one location to a second location to a third location. His belongings were taken from him, rifled through by two customs agents, then patted down. They had their IDs, told not to leave, told to stay on the bench, and was sitting watching while they started pulling substances out of bags and was testing it and was questioned while the testing was going on. The fact that you can't leave and they're undoing your bags, that happens to me whenever I come back from a trip abroad. Actually, they go through my stuff, something terrible in the Seattle airport. I don't know if that's enough to make it out. Well, that's why there are other factors here. I mean, you come back from going abroad, you have to stand there while they take apart your suitcase. Yeah, and what's interesting about this is that they kind of went through the bags at one point while they were standing outside at the table, but then they put them into a more enclosed area and they performed the pat down, still had the IDs, had them sit down and told them to stay there. And I think really what's most compelling about what happened was that they just kind of set the bottles out and then started testing one. And that's very similar to Estrada Lucas, where the point wasn't so much the officer's subjective belief that now he had found evidence of a crime. It was the fact that he displayed the jewelry in front of Ms. Estrada Lucas as he started to ask questions about it. Anyway, I see that my time is up. And if your audience has any other questions, I'll answer them. But otherwise, thank you very much. Thank you, Counsel. United States v. Hillman is submitted. We are recessed until 9 a.m. tomorrow. All rise. Thank you.
judges: D.W. Nelson, Fernandez, Kleinfeld